**WAL–MART STORES, INC., Appellant,**

v.

**Rebecca TINSLEY and Dan Tinsley, Appellees.**

**No. 06–98–00106–CV.**

Court of Appeals of Texas, Texarkana.

Submitted June 24, 1999.

Decided July 9, 1999.

J. Preston Wrotenbery, Kevin Dean Jewell, Magenheim, Bateman, Robinson, Houston, for appellant.

John A. Cowan, Brent Wayne Coon, Provost Umphrey Law Firm, Beaumont, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

OPINION

Opinion by Chief Justice CORNELIUS.

Rebecca Tinsley slipped and fell in a Wal–Mart store in Orange, Texas. Tinsley and her husband, Dan Tinsley, brought a negligence suit against Wal–Mart Stores, Inc., and the jury awarded Ms. Tinsley damages in the amount of $430,000.00. Because the jury found Wal–Mart ninety percent negligent and Tinsley ten percent negligent, her damages were reduced to $387,000.00. The jury also awarded $5,000.00 in damages to her husband. Both were awarded prejudgment interest.

On September 11, 1993, Tinsley was shopping at a Wal–Mart store with her brother, Ron Sweeney. She picked up a plant from the garden section while Sweeney went to the front of the store to get a shopping basket. Tinsley proceeded to the front of the store to meet Sweeney. When she reached an area near the front registers and the housewares section, she slipped and fell in a puddle of water. Her feet slipped from underneath her as she entered the water, and she fell on her left side, jerking her head and injuring her back.

By its first point of error, Wal–Mart contends that the trial court erred in rendering judgment on the verdict because the evidence was legally and factually insufficient to support the jury's answer to question one, which addressed Wal–Mart's negligence. Specifically, Wal–Mart contends there is no evidence or insufficient evidence that it had constructive knowledge that the water was on its floor.

In reviewing a no evidence point, we consider only the evidence tending to support the jury's verdict and disregard all evidence and inferences to the contrary. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex.1992); *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.*, 774 S.W.2d 666, 668 (Tex.1989). If there is any probative evidence to support the verdict, we must overrule the no evidence challenge. *Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex.1989); *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987).

An owner/operator owes an invitee a duty to exercise ordinary care to protect the invitee from risks of which the owner is actually aware, and also those risks of which the owner should be aware after reasonable inspection. *Motel 6 G.P., Inc. v. Lopez*, 929 S.W.2d 1, 3 (Tex.1996). However, a land possessor's duty toward its invitee does not make the possessor an insurer of the invitee's safety. *Wal–Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936 (Tex.1998). It is undisputed that Tinsley was an invitee.

For the Tinsleys to recover on their premises liability claim, they must have pleaded and proved that Wal–Mart (1) had actual or constructive knowledge of some condition on the premises; (2) that the condition posed an unreasonable risk of harm; (3) that Wal–Mart did not exercise reasonable care to reduce or eliminate the risk; and (4) that Wal–Mart's failure to use such care proximately caused Rebecca Tinsley's injuries. *See Wal–Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d at 936; *Keetch v. Kroger* Co., 845 S.W.2d 262, 264 (Tex.1992); *Richardson v. Wal–Mart Stores, Inc.*, 963 S.W.2d 162, 165 (Tex. App.-Texarkana 1998, no pet.).

A threshold requirement for a slip-and-fall claim is that the premises owner/operator had actual or constructive knowledge of a premises defect. *Motel 6 G.P., Inc. v. Lopez*, 929 S.W.2d at 3. The actual or constructive knowledge requirement can be met by showing that the substance causing the fall was on the floor for a sufficient length of time that, in the exercise of ordinary care, it should have been discovered and removed. *Keetch v. Kroger* Co., 845 S.W.2d at 264; *Richardson v. Wal–Mart Stores, Inc.*, 963 S.W.2d at 165. This requirement can be shown

through direct or circumstantial evidence. *See Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d at 936; *Richardson v. Wal–Mart Stores, Inc.,* 963 S.W.2d at 166.

■ The central issue in this case is whether Wal–Mart had constructive knowledge of the water on the floor. There is no evidence that Wal–Mart employees put the water on the floor or actually knew it was on the floor and negligently failed to remove it. The disputed question on appeal is whether sufficient evidence exists to support a finding that the water was on the floor for such a length of time that Wal–Mart should have discovered it and removed the substance.

■ The evidence of Wal–Mart's constructive notice of the water is circumstantial. Tinsley did not produce any direct evidence of the length of time the puddle of water had been on the floor. The Texas Supreme Court, in *Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d at 936, held that when circumstantial evidence is relied on to prove constructive notice, the evidence must be sufficient to support a conclusion that it is more likely than not that the dangerous condition existed long enough to give the proprietor a reasonable opportunity to discover the condition. Evidence that only supports the possibility that the dangerous condition existed long enough to give Wal–Mart a reasonable opportunity to discover it is legally insufficient. *See id.*

Tinsley testified that after she slipped and fell in the water, she looked directly up at the ceiling and noticed big circles and yellow stains on the acoustic ceiling tiles. She stated that it looked like water had dripped through the tiles and then dried. Tinsley also said that some portions of the ceiling tiles looked darker, as if the tiles had recently been wet. Tinsley said that she had seen water dripping into buckets from ceiling tiles in other locations of the Wal–Mart store on several prior occasions. Sweeney also testified that after he arrived on the scene, he looked up and saw a wet, sagging ceiling tile. He

also saw yellow circles and gray portions of the ceiling tiles that were wet.

Both Tinsley and Sweeney testified that she slipped in "a pretty good size puddle," such that probably three quarters of her body was lying in water. When she fell in the puddle, her clothes became wet. She slipped and fell in the "front action alley" in the front part of the store, approximately forty steps away from the courtesy booth. Kathy Henry, Wal–Mart's assistant manager, testified that she investigated the scene to look for the source of the water. She stated that she walked around the counter area and the front action alley and could not find the source of the puddle, such as a cup from the snack bar.

Linda Morgan, a department manager for Wal–Mart, testified that she had placed buckets in the store to catch water dripping from the ceiling. Morgan stated that the source of the dripping water was condensation on pipes from the air-conditioning system. She said a pipe for the air-conditioning system ran above the ceiling tiles, and that it built up condensation, causing water to drip down through the ceiling tiles. When asked why water would be dripping in the front action alley, Morgan stated it was her understanding that the water came from the air-conditioning unit. However, she said that she did not specifically recall water ever leaking in the front action alley. She said Wal–Mart's policy regarding the leaking ceiling was to clean up the puddle on discovery, report the leak to a manager, and place a bucket under the tiles to catch the water. Morgan also testified that the size of the puddle of water on the floor would vary depending on how long it took a Wal–Mart associate to discover it.

Henry also testified that the water would drip through Wal–Mart's ceiling tiles due to condensation from the air-conditioning units. She stated the air-conditioning system was old and would freeze during the summer. Occasionally, the air-conditioning system would cause condensation to drip through the ceiling

tiles. Henry said that water had dripped through the ceiling tiles in the front action alley, but at a location some forty to fifty feet from where Tinsley fell. She said that when the ceiling tiles would become soaked with water, Wal–Mart employees would take down the tiles so they would not fall on a customer.

There is thus some evidence to justify the jury in believing that, more likely than not, water dripped onto Wal–Mart's floor over an extended period of time, leaving a large enough puddle that Wal–Mart employees should have discovered the dangerous condition. *See Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d at 936. Tinsley and Sweeney stated she slipped in a large puddle. Morgan testified that when water would leak through the ceiling tiles, water would gather on the floor until someone discovered it. The size of the puddle on the floor would indicate how long the water had been dripping. Henry and Morgan, both Wal–Mart employees, testified that water would drip from the ceiling tiles. There is no evidence that any leak was sudden or of a large quantity at any time. The length of time required for a large quantity of water to accumulate would also be sufficient time for Wal–Mart employees to discover and eliminate the puddle. It is reasonable to conclude that, more likely than not, the water was slowly dripping on Wal–Mart's floor for a sufficient length of time to create a large puddle. Additionally, Sweeney testified that the large puddle was forty steps from the courtesy counter. The evidence, viewed in the light most favorable to the verdict, presents more than a mere possibility that the water was on the floor long enough for Wal–Mart employees to have discovered the puddle. We find that Tinsley's circumstantial evidence is legally sufficient to support the jury's verdict.

■ Wal–Mart also contends that the evidence is legally insufficient to support a causal link between any leak and the area where Tinsley fell. We disagree. Although there is no evidence that an air-

conditioning unit was situated directly over the location where Tinsley fell, she testified that the ceiling tiles above where she fell were stained with yellow circles as if tiles had been wet and then dried. Both Tinsley and Sweeney stated that portions of the tiles were gray and appeared wet. Further, Henry and Morgan testified that the ceiling would leak in other locations because of condensation from old air-conditioning units. Most importantly, it was Morgan's understanding that pipes ran above the ceiling tile in the front action alley, and condensation would drip down from the pipes. The evidence is legally sufficient to support a finding that, more likely than not, the water came from the ceiling tiles due to the leaking condensation.

Next, Wal–Mart contends that the evidence is factually insufficient to support the jury's verdict. When considering a factual sufficiency challenge to the evidence, we review the entire record and set aside the verdict only if it is against the great weight and preponderance of the evidence. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). The parlance used by the courts of appeals is that a finding is against the great weight and preponderance of the evidence if it is "manifestly unjust," "shocks the conscience," or "clearly demonstrates bias." *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). We may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *See id.* at 634.

In addition to the evidence detailed above, we must also consider the following evidence for our factual sufficiency review. Charles Dunagen, Wal–Mart's store manager, testified that the leaks in the store's ceiling only occurred around the air-conditioning unit. He stated that the leaks came from the intake vents that were located directly under the units. Henry testified that air-conditioning leaks did not occur in the area where Tinsley fell.

William Colthorp, a registered professional engineer, also testified for Wal-Mart. In January of 1997, Colthorp went to the old [1] Wal-Mart store to locate the area where Tinsley slipped and fell. Colthorp stated that he was given a photograph of the ceiling tiles above the area where Tinsley fell and was able to find the area that the picture reflected. He used a stepladder to get up to the ceiling tiles and inspected the tiles for any staining. Colthorp also removed a tile and looked above the drop ceiling for evidence of air-conditioning equipment. He did not see any air-conditioning units or any evidence of chronic roof leaks in the area. A leak from an air-conditioning unit, Colthorp said, would have to be somewhere in the vicinity of the air-conditioning equipment.

Colthorp also performed tests to determine if the ceiling tiles would stain. He purchased a box of tiles of the same design and appearance and tested them in his office. Colthorp did not test any tiles from the Wal-Mart store. He came to the conclusion that the ceiling tiles did not stain from water or absorb water. Colthorp told the jury that the orangish color on the tile he took from the Wal-Mart store was glue probably transferred during the manufacturing process.

Considering all the evidence in the record, we conclude that the jury's verdict is not so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. The jury was free to believe or disbelieve Dunagen's and Colthorp's testimony that the leaks only occurred around the air-conditioning units. Moreover, Morgan testified that if water was leaking in the front action alley, it probably came from the pipes used by the air-conditioning system, rather than from the units themselves. The jury could have also accepted Tinsley's and Sweeney's testimony that the ceiling tiles were stained and rejected Colthorp's testimony that the tiles do not stain.

■ Next, Wal-Mart contends that the trial court erred by allowing Sweeney to testify, because the Tinsleys did not timely supplement their discovery responses with Sweeney's correct address. Wal-Mart argues that the Tinsleys did not show good cause for their failure to supplement Sweeney's correct address and, thus, Sweeney should not have been allowed to testify.

At the time the lawsuit was filed, Sweeney's address in Deweyville, Texas was correctly listed by the Tinsleys in their initial response to Wal-Mart's interrogatories. On June 9, 1995, the Tinsleys supplemented their discovery responses and included Sweeney's then current address in Lake Charles, Louisiana. Before the trial began, Wal-Mart attempted to contact Sweeney, but was not able to locate him. On December 15, 1997, the second day of trial, Wal-Mart objected to the testimony of Sweeney on the basis that Sweeney had changed his address since the last supplementation. Wal-Mart's attorney informed the trial court that the Tinsleys had supplemented Sweeney's current and correct address on the first day of trial. The Tinsleys' attorney informed the trial court that he had just learned of Sweeney's correct address and informed Wal-Mart as soon as he learned of the new address.

The trial court held a hearing on Wal-Mart's motion to exclude Sweeney's testimony. The trial court stated during the hearing that, as a practical matter, it would be difficult for an attorney to sit down and check every address and telephone number of all the witnesses who may be listed. At the hearing, the trial court offered to declare a mistrial, giving the Tinsleys an opportunity to supplement and allowing Wal-Mart an opportunity to depose Sweeney. The court allowed a five-minute recess to allow the attorneys to

---

1. In January of 1995, Wal-Mart closed the store where Tinsley was injured and opened a new store in Orange, Texas.

come up with a better solution that would resolve the problem. After the recess, Sweeney took the stand and testified to the facts concerning his address changes. Following the testimony and argument from the attorneys, the trial court ruled that the Tinsleys complied with their duty to supplement and "the failure to amend the answer was not, in substance, misleading."

At the close of the hearing, the Tinsleys offered to make Sweeney available for a deposition before calling him to the stand, either by recess or over the lunch hour, and offered to pay for the costs associated with the expense of the deposition. The trial court noted the Tinsleys' offer and was willing to accede to it if Wal–Mart agreed. Wal–Mart declined on the basis that if Sweeney had damaging information, the Tinsleys' offer would not resolve the problem. The trial court stated that Wal–Mart could depose Sweeney even without giving up their objection, and Wal–Mart still refused the offer.

Parties have an affirmative duty to supplement discovery answers, including supplementation necessary to supply addresses for individuals identified by a party as fact witnesses in response to a discovery request. Tex.R. Civ. P. 166b(6) (Vernon 1997) (now Tex.R. Civ. P. 193.5); *see Boothe v. Hausler*, 766 S.W.2d 788, 789 (Tex.1989); *Torres v. Caterpillar, Inc.*, 928 S.W.2d 233, 243 (Tex.App.-San Antonio 1996, writ denied). At the time this case was tried, Tex.R. Civ. P. 215.5 provided that the sanction for failing to supplement a discovery response was automatic exclusion of the testimony of the witness for whom the supplemental information was not provided. Tex.R. Civ. P. 215.5 (Vernon 1997) (now Tex.R. Civ. P. 193.6);[2] *Boothe v. Hausler*, 766 S.W.2d at 789; *Morrow v. H.E.B., Inc.*, 714 S.W.2d 297, 297 (Tex. 1986). The only exception to this rule was that the trial court, for good cause shown, could allow the testimony. Tex.R. Civ. P. 215.5; *see Boothe v. Hausler*, 766 S.W.2d at 789.

■ The trial court has the discretion to determine whether the offering party has met his burden of showing good cause to admit the testimony. *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911 (Tex.1992). The ruling of the trial court here does not expressly state that Tinsley demonstrated good cause in failing to supplement Sweeney's address. We find, however, that the trial court implicitly found good cause. *See Ramos v. Champlin Petroleum Co.*, 750 S.W.2d 873, 877 (Tex.App.-Corpus Christi 1988, writ denied). The facts show that Wal–Mart was not misled to its detriment; it did not contact the Tinsleys' counsel to inquire into Sweeney's whereabouts; and it refused a mistrial and a delay with an opportunity to depose Sweeney before trial.

■ At the hearing on Wal–Mart's motion to exclude Sweeney's testimony, the trial court offered to declare a mistrial and postpone the trial to allow the Tinsleys to properly supplement and Wal–Mart to depose Sweeney. The trial court also was willing to accept the Tinsleys' offer to recess the trial until Wal–Mart had sufficient time to depose Sweeney. Wal–Mart's counsel rejected these offers, and even stated to the trial court that it was Wal–Mart's practice not to depose any witness except the plaintiff and possibly the plain-

---

2. The matter is now covered by Tex.R. Civ. P. 193.6, which provides in part as follows:

(a) *Exclusion of Evidence and Exceptions.* A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that:

(1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or

(2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

tiff's spouse, when appropriate. When a party has failed to identify evidence in response to a discovery request, the trial court has the discretion to postpone the trial and impose sanctions on the offending party for abuse of the discovery process. *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d at 915–16. Such sanctions may be used to compensate the nonoffending party for any wasted expense in preparing for trial. *Id.* at 915. Although the trial court should not allow delay to prejudice the nonoffending party, the court should ordinarily be able to cure any prejudice by the imposition of just sanctions. *Id.* at 915–16.

The trial court was willing to postpone the trial so Wal–Mart could depose Sweeney. Wal–Mart rejected each offer by the trial court to delay the trial. The Tinsleys even offered to pay for the expenses associated with the cost of deposing Sweeney. Because each offer was rejected, we find that Wal–Mart waived [3] any complaint about allowing Sweeney's testimony.

■ Moreover, we find the admission of Sweeney's testimony was harmless. First, Sweeney's testimony is merely cumulative of Tinsley's testimony. Tinsley testified that when she looked up at the ceiling above where she fell, she noticed ceiling tiles stained with yellow circles. She also stated that some tiles had darker portions, and she could tell by looking at the tiles that they had recently been wet. She did not say she saw water dripping from the ceiling at the time of her fall. Sweeney testified that when he arrived, he saw wet and stained ceiling tiles. He saw the same yellow stains on the tiles and the darker and grayer portions that were wet. He did say that it appeared to him that the tiles were still wet. He also said the tiles had a saggy appearance that caused him to think they were wet. Additionally, he did not see any water drip from the ceiling.

Sweeney's testimony did not add anything new to Tinsley's testimony, but only used different words to describe the same condition of the ceiling tiles. Because Sweeney's testimony is merely cumulative of Tinsley's testimony, the admission of his testimony was harmless.

■ Finally, Wal–Mart contends there is no evidence or insufficient evidence to support the damage award by the jury. Wal–Mart contends that Tinsley's medical bills were not supported by the proper predicate. It also argues there is no evidence of disfigurement and Tinsley suffered from a substantial pre-existing condition.

During the trial, the Tinsleys introduced the videotaped deposition of Dr. Stanley Gertzbein. Dr. Gertzbein was certified as an expert in the field of spinal cord injuries. He testified that he had the opportunity to review Tinsley's medical bills, which included his fee, the hospital bill, the anesthesiologist's fee, the radiologist's fee, the pathologist's fee, and all of the related charges pertaining to her back surgery. He stated he was familiar with the customary reasonable charges in the area, and in his opinion the charges were reasonable and necessary. Dr. Gertzbein also stated that the charges were necessary because of Tinsley's fall in the Wal–Mart store.

Wal–Mart contends that Dr. Gertzbein could testify about the reasonable and necessary cost associated with his fee, but could not properly prove the reasonableness and necessity of the other medical expenses. We disagree. Dr. Gertzbein qualified as an expert and stated he was familiar with the customary, reasonable charges for medical services. As such, he was permitted to testify regarding the reasonableness and necessity of Tinsley's medical expenses. *See Oil Country Haulers, Inc. v. Griffin,* 668 S.W.2d 903, 904

---

**3.** The court in *Remington Arms Co. v. Caldwell,* 850 S.W.2d 167 (Tex.1993), held that a party could not be said to waive discovery abuse that it discovered only after the trial began. In this case, Wal–Mart knew about the failure to supplement Sweeney's address before the trial began, and also at the time the trial court offered a mistrial or a delay to remedy the violation.

(Tex.App.-Houston [14th Dist.] 1984, no writ). Because Dr. Gertzbein testified that the charges were reasonable and necessary and were a direct result of Tinsley's fall in the Wal–Mart store, the Tinsleys sufficiently proved their medical expenses.[4]

■ Wal–Mart also contends there is no evidence that Tinsley suffered any compensable disfigurement. Wal–Mart contends that Tinsley only received a small scar on her lower back and hip which is covered by her clothing. The term "disfigurement" has been defined as that which impairs the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapened, or imperfect, or deforms in some manner. *Goldman v. Torres*, 161 Tex. 437, 341 S.W.2d 154, 160 (1960); *Hopkins County Hosp. Dist. v. Allen*, 760 S.W.2d 341, 343 (Tex. App.-Texarkana 1988, no writ). We find that Tinsley's scar from her surgery is a compensable disfigurement. Wal–Mart does not cite any cases to the contrary, and there are several cases upholding past and future disfigurement awards for surgical scars. *See Hopkins County Hosp. Dist. v. Allen*, 760 S.W.2d 341; *see also Northwest Mall, Inc. v. Lubri–Lon Int'l, Inc.*, 681 S.W.2d 797, (Tex.App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.).

■ Wal–Mart also contends that the jury's award of damages is against the great weight and preponderance of the evidence because Tinsley's pre-existing condition contributed substantially to her injuries. In 1990, Tinsley was injured in an automobile accident and required back surgery as a result. Additionally, Dr. Gertzbein testified that Tinsley had a degenerative disk disease that was common in people of her age. Dr. Gertzbein also testified, however, that all the pain for which he treated Tinsley was a result of her fall at the Wal–Mart store. He said he understood Tinsley had fully recovered from her previous back injuries and did not experience any pain until she fell in 1993. Tinsley's husband testified that Tinsley was not limited in her activities before her fall and had no remaining back problems from other causes.

We conclude there is sufficient evidence to support the finding that Tinsley's injuries were a result of her fall in the Wal–Mart store and not a result of a pre-existing injury.

Because sufficient evidence exists for Tinsley's medical expenses and disfigurement, we need not consider Wal–Mart's remaining argument that if there is no evidence to support one or more of the damage elements, a new trial must be ordered with the damage elements submitted separately. Wal–Mart does not contend that no evidence exists on the other damage elements of physical pain, mental anguish, and physical impairment.

For the reasons stated, we affirm the judgment of the trial court.

---

4. We note that Tinsley attached affidavits from the custodian of records for each medical institution from which she incurred an expense. The affidavits follow the form provided in Tex. Civ. Prac. & Rem.Code Ann. § 18.001 (Vernon 1997). In their brief, the Tinsleys argue that they proved the medical expenses through the testimony of Dr. Gertzbein and the affidavits of the custodians of records. Although Section 18.001 allows a party to prove the reasonableness and necessity of medical expenses through an affidavit of a custodian of medical records, the Tinsleys' affidavits do not state that the medical expenses were reasonable and necessary. Because Dr. Gertzbein testified that Tinsley's medical expenses were reasonable and necessary and a result of her fall at Wal–Mart, the Tinsleys did not need to prove the medical expenses through the affidavits.